Maddox *v.* Apperson.

S. C. MADDOX, Administrator of Washington Bolton, deceased, *v.* E. M. APPERSON, Executor of Wade H. Bolton, deceased, *et al.*

1. CHANCERY PLEADINGS AND PRACTICE. *Bill of review. Evidence. Fraud.* Upon a bill to set aside a decree it must be made evident that complainant had a defense on the merits or to the relief sought, and that such defense or right had ·been lost to him without such loss being attributable to his own omission, neglect or default. The loss of a defense or the failure to obtain relief, to justify a court of equity in setting aside a decree must, in all cases, be occasioned by the fraud or act of the prevailing party or by mistake or accident on the part of the losing party, unmixed by any fault on his part or his agents.

2. SAME. *Same. Suppression of evidence.* Upon a bill of review where fraud is relied on by suppression of evidence, it must clearly appear that the evidence assumed to be withheld was not only material, but would have unquestionably changed the result, had it been before the court on the original hearing, and the suppression of evidence in the possession of the opposite party, must be withheld under such circumstances that the party was under a legal obligation to have revealed or furnished, or he must have used some artifice by which they were concealed from the other party.

3. EXECUTOR. *Evidence.* An executor is not bound to volunteer any disclosures to the injury of the estate he represents.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

FINLAY & PETERS for complainant.

MYERS & SNEED, GANTT & PATTERSON, SMITH & COLLIER, J. B. HEISKELL and WAT. STRONG for defendants.

FREEMAN, J., delivered the opinion of the court.

On the 10th of June, 1868, Sarah W. Bolton, executrix of Washington Bolton, filed her bill in the chancery court at Memphis, against Wade H. Bolton and Thomas Dickens, with F. M. Cash, administrator of Isaac Bolton, for a general account of a partnership that had existed from 1850, extended two years in June, 1857, between her husband, Washington Bolton, and the two living defendants and the intestate of the other. Wade H. Bolton, after answering the bill, was killed in July, 1869, and the suit was revived and prosecuted against his executor, E. M. Apperson, and the other parties, when in 1870, Dickens was killed, and his representative made a party. Such proceedings were had in this case that in 1880, by a decree of this court, the bill was dismissed and the suit finally terminated by a decree to this effect.

That decree was based on two propositions, each of great weight and probably controlling, at any rate when combined, certainly determinative of the case, on settled principles of law. First, that the books exhibited as showing the transaction of the branch houses at Lexington, Kentucky, and Vicksburg, Mississippi, were of such an incomplete character, so unsatisfactory, as to furnish no basis for a settlement of the transactions they referred to. After referring to the frag-

mentary character of this book at Lexington, showing it to be in many instances merely "brief memoranda, showing shipment or sales of negroes, but not showing to whom sold, or by whom, the date of the sale, *nor what* was done with the proceeds," the Chief Justice added : "Besides, this book furnishes intrinsic evidence of being an incomplete statement of the business done by him," that is, Washington Bolton. The same is said with equal emphasis of I. L. Bolton's book of memoranda, and the accounts of the other parties to the firm. The like conclusion was also reached in reference to the cotton transactions of the firm.

The second ground on which the court acted was the lapse of time after the dissolution of the partnership, the fact that all the parties were dead, and that each, after the dissolution, "had seemingly been satisfied with his share of the whole, which the end of the partnership in June, 1857, left in his hands, retired or engaged in other occupations, and no step was taken until about eleven years after the expiration of the partnership towards having a settlement. It was therefore concluded, that "if any one or more of the partners are subjected to loss, it results from their own negligence," but it is manifest, says the Chief Justice, "that a court of chancery cannot reach any settlement in this case which might not be even more unjust than to leave ·the parties where they have placed themselves by their own laches."

In this state of the case, on February 1, 1883, · the present bill was filed, claiming to be an "original bill; to impeach this decree for fraud, and in the na-

ture of a bill of review." It is now in argument treated either as an original bill to impeach the decree for fraud, or as a bill of review to review and set it aside. It is insisted it is sustainable in either aspect. We need but say, that it is not important what the pleading is called, the essential matter is, that it charges a state of facts from which, if proven, the legal result sought will follow, or on which any relief under the general prayer can be granted in a court of chancery. As a matter of course, as a bill of review, there must be certain allegations as to the former case, as to the pleadings, the decree made, and the error found in it—if for error apparent—or if for newly discovered testimony, to show the materiality of the new evidence, and that it would probably change the result before reached; but all this is included under the principle stated—the right sought being a review and reversal of the former decree.

This bill, after stating the fact of the filing of the original bill, that its purpose was a settlement of the partnership matters of the late firm of Bolton, Dickens & Co., in the negro trade and cotton business; that the same proceeded to a hearing upon bill and answers of all the parties and proof, and was decided in the Supreme Court on May 20, 1880, the bill dismissed, each party being taxed with one-fourth of the costs.

The ground of the decision in that case is stated to have been, that the loss of papers, etc., involved the transaction in such obscurity that a settlement would fall short of reaching the truth and doing

justice; in other words, the court did not refuse juris-
diction on account of lapse of time or the statute of
limitations, but simply because an account could not
be properly taken.

The substance of the charges of the original bill
are then set out, charging that very large profits had
been made, and that one of the partners had shortly
before the termination of the partnership, killed one
McMillan, and was tried for the offense, and the
reason there had been no settlement of the business
in the lifetime of the parties was, that Wade Bolton
and Isaac, being brothers, insisted that the expenses
of this litigation should be paid out of the firm assets,
to which the other partners demurred.

It was further charged that the center of business
was in Memphis, but large purchases of slaves were
made by Dickens from Richmond, Virginia, and Isaac
Bolton, at Vicksburg, Mississippi, who sold them; that
the funds, capital and profits accumulated in the hands
of Wade Bolton, at Memphis, who was the book-keeper
and cashier of the firm, charging fraud and unfair
dealing upon the part of said Wade. These allegations
were, as alleged, the basis on which the account was
sought.

The administrator in the present bill now charges,
that while the book of the husband of the complain-
ant was filed, showing the purchases in 1855–6–7, she
was unable to get at or produce the books kept by
Wade H. Bolton, at Memphis, and was thus left to
secondary evidence on that portion of the account.
It is insisted the proof showed in that case that about

$100,000 of the firm assets was used in payments for defense of Isaac Bolton.

It is then charged, in general terms, that Wade H. Bolton had on hand large amounts of firm assets. in money, notes, drafts, and while the suit was pending, had evidences of the disposition of these assets which he withheld from the court, and that there were papers in the form of "bills and drafts in the hands of Wade H. Bolton, which he unlawfully suppressed, which, as cashier and bookkeeper, would have made the right of relief plain, and these were suppressed."

It is then charged, that since the final decree, newly discovered testimony has been found, necessary in that cause, which was fraudulently suppressed and withheld, and which would have made a material difference in the state of the record, and enabled the court to reach a different conclusion.

Somewhat in detail this charge is extended in after parts of the bill, the substance being that Wade H. Bolton, at the time of the suit, had large amounts of the drafts of the firm in his possession drawn by himself, which he had partly destroyed to prevent complainant from getting at them, and these drafts would have shown the state of the firm account, and that his plan of defense was to suppress and obscure the evidence so as to prevent the court being furnished with the basis on which an account could be taken, on the basis of the fraudulent suppression of papers, and that he has now learned he can prove the fact from the deposition of E. M. Apperson, from which he quotes the following: . "I have no hesitancy

in expressing the opinion that if the other side (meaning complainant) had succeeded in bringing out the facts within my knowledge, derived from Mr. Bolton, and the evidence which came to my possession as his executor, the gigantic lawsuit (meaning the case of said Bolton referred to) would have been decided differently, and Bolton's estate rendered insolvent."

It is then charged there is no other way to get at this proof except by a discovery from E. M. Apperson, the executor of Wade Bolton, and further, that they verily believe that the bills of sale of all negroes (required by articles of partnership, with the exception of those retained), may be in the hands of said Apperson, together with other papers on which the account can readily be taken and the rights of the parties be adjusted. On this basis a discovery of all he may know is asked of E. M. Apperson, in order to develop the proof assumed to have been fraudulently suppressed, and now claimed to have been newly discovered.

This bill was demurred to on many grounds, and demurrer overruled. In the first aspect of the case, as a bill to set aside the decree for fraud, we notice the questions thus raised by the demurrer, and also on the facts. They are, or part of them, substantially, that the bill does not set out the new testimony assumed to be suppressed, so that the court can judge whether, if made, it would have changed the result in the original case, nor any sufficient reason why Bolton or Apperson were not compelled to file any papers they had, or as witnesses to disclose any

facts known by them while that case was pending, and that it was gross negligence on the part of complainant not to have had this evidence before the court.

It is also objected that the discovery from E. M. Apperson might as well have been had in the original case as in the present proceeding, or he might have been used as a witness. Without stating in detail the specific points raised by the demurrer, it suffices to say, that any legal defense probably that could be interposed is found in this record. We proceed to dispose of the questions deemed by us vital to the determination of the cause. In doing so we may treat both the questions presented on demurrer, and the questions on the facts together, so far as the present aspect of the case is concerned.

The case is this: After a long and hotly contested litigation, lasting years, the matter is ended by a final decree in this court. Immense volumes of testimony had been accumulated, and the energies of the ablest counsel exerted on both sides to develop all the facts possible. At the end of it, it was found by this court, no sufficient evidence had been presented on which an account doing justice to the parties could be had, and that the parties seeking the account had for eleven years slept on their rights, the original parties all dead, and so the bill was dismissed.

Under these circumstances the maxim of our jurisprudence that there should be an end to litigation, as well as all the traditions of the law, in favor of the conclusive effect of judgment once had, demanded that a very strong and clear case be made out, both by

allegation and proof, before the solemn decree shall be set aside, and a matter so much litigated already be reopened. When a party has once had an opportunity to be heard, and neglects to do so, he must abide the consequences of his neglect. A court of equity cannot relieve him though the judgment is manifestly wrong": Freeman on Judg., sec. 485.

But it is settled law that the jurisdiction of that court is complete to set aside decrees obtained by fraud on an original bill filed for that purpose: *Ibid,* 486–7; *Walker* v. *Day & Griswold,* 8 Baxt., 82. Such a bill "must state the decree and the proceedings which lead to it, *with* the circumstances of fraud on which it is impeached," with an appropriate prayer for relief: Adams Doct. Eq., margin, page 420.

But to entitle a party to this relief from a judgment or decree, it must be made evident that he had a defense on the merits, or we may add, in case of the complainant, a right to the relief sought, and that such defense or right has been lost to him without such loss being attributable to his own *omission, neglect* or default. The loss of a defense, or the failure to obtain relief, to justify a court of equity in setting aside the judgment or decree, must in all cases be occasioned by the fraud or act of the prevailing party, or by mistake or accident on the part of the losing party, unmixed with any fault on his part or his agents: Freeman on J., secs. 486, 437, 489.

We have taken these rules from Mr. Freeman's work on Judgments, as the fair result of the authorities and general principles established by them.

We now add what is clearly implied in any statement of the rule, that where fraud on the part of a defendant, as in this case, is relied on to set aside a decree, by suppression of evidence, it must clearly appear, especially after so long a period has elapsed, that the evidence assumed to have been withheld was not only material, but would unquestionably have changed the result had it been before the court on the original hearing. It would not do to reopen such a case on a doubtful statement of facts, and most certainly on a mere allegation that the party had learned of the opinion of a witness, however intelligent, that he knew facts which, if they had been known, in his judgment, the case would have had a different result. The court must have the facts specifically stated, verified by affidavit of the complainant, and then proven in the clearest manner, from which it can judicially see that the result would have been different had they been presented. In case of a charge of suppression of evidence in the possession of the opposite party, it is equally clear that the facts so withheld must be such as under the circumstances of the case that party was under a legal obligation to have revealed or furnished, or he must have used some artifice by which they were concealed from the other party, and he thereby wrongfully prevented from obtaining that which, without such artifice, he would have had, and thus have been able to have changed the result. That all these elements are essential in a case like the present, and should be clearly charged in the bill, seems too obvious to require

the support of authority farther than we have cited.
In the light of these settled principles, we look at
this bill in connection with the facts of the original
case to see whether it alleges, or the proof developed,
entitles complainant to set aside the decree for the
alleged frauds charged.

The charges are substantially that Wade H. Bol-
ton's plan of defense was to suppress the evidence in
his possession, and the only fact alleged as a suppres-
sion on his part is the destruction or suppression of
a large amount of drafts drawn by himself, which, it
is said, if they had been produced would have changed
the result.   In addition, however, it is generally charged
that he had in his possession papers that would have
shown a different state of things from what was de-
veloped.    But except the charge of destruction of
drafts, we have no fact from which we can see com-
plainant has any basis for his charge.

But take it as true that drafts in his possession
had been destroyed, it needs only to look at the
grounds on which the case was decided in this court
to see that the result could not in the slightest de-
gree have been changed.    It was, that there was no
satisfactory evidence at all furnished by the books then
presented, or testimony as to the firm transactions at
Vicksburg and Lexington, and none, we may add, as
to the other parties in Richmond.    It was charged,
as we see in the original bill, that one hundred thou-
sand dollars was made by Isaac Bolton in Vicksburg
alone in the year 1856.    But to confine ourselves to
the allegations of the bill, it is impossible to see how

the knowledge of the fact that a large amount of drafts had been destroyed could furnish a sufficient basis on which to state a complete account of such mighty transactions as were had by this firm when, as the court found, there was no evidence furnished by the books then before this court as to what had occurred at Vicksburg and Lexington. As well said by Judge Cooper in *Hicks* v. *Chadwell*, 1 Tenn. Ch. R., 256, no partnership account can be properly taken without first ascertaining whether there has been a profit or loss in the business, and then finding out, by separate accounts of each of the partners with the firm, how this profit or loss, as the case may be, should be divided between them; much more in case of a firm having branch establishments where it is evident the larger portion of the buying and selling was done, could such an account be had without bringing into the account what was done at these places. Such account at most could only be based on the amount of these drafts, and would be an arbitrary charge in gross, without the means of adjusting the other equities growing out of the immense transactions shown to have been had by this firm.

The able counsel of complainant in their zeal evidently go upon the assumption that in *odium of spoliation* the court would have made an arbitrary adjustment regardless of what should otherwise have been developed in a general account. No such principle can be judicially recognized. Courts of equity do not sit to visit penalties, but to adjust the rights of parties.

But when we come to look at the proof developed

in the answer and testimony of Mr. Apperson, the question is made too clear for argument. He gives, as he remembers after the long lapse of time, his recollection of conversations with Mr. Bolton on this subject, in which he gave as his reasons for endeavoring to supply evidence, or at any rate prevent the complainant from getting these drafts, that his books and vouchers had been burned with his house, and that he believed it had been caused to be done by Dickens, the other partner, with a view of preventing his showing acquittances for all these drafts, and this was the reason why he sought to put' the drafts out of the way. There is no doubt, or at any rate, complainant in this case is in no condition, after presenting Mr. Apperson as the witness on whose testimony this whole case is to be opened, to question that this was the motive that prompted the concealment if not the destruction of a portion of the drafts referred to. From this proof we must assume that there was in fact only an apparent change in them, but that in fact, if the books had been present, that appearance would be met and the fact be the other way. So that in fact, if the drafts were charged against Bolton now on this proof, it would be wrongful, and complainant obtain an unfair and unjustifiable advantage. We cannot be soberly asked to do this.

But when we look to what is shown in the other case, and strongly intimated in the opinion of the Chief Justice, that the complainant's testator, Washington Bolton, had concealed and withheld the books showing his transactions at Lexington, and the books

Maddox *v.* Apperson.

presented were evidently only "brief memoranda," and as said by the Chief Justice, "besides furnish intrinsic evidence of being incomplete statements of the business done by the parties," we can see no scintilla of legal ground on which to assent to the contention of counsel. These books now presented by counsel as furnishing the basis on which to take an account of the business of the firm at the two points indicated, were the same referred to by the Chief Justice in his opinion, and there is certainly nothing added in this case which in any way serves to supply the deficiency then found and adjudged to exist. There is nothing to sustain this view of complainant's case. A nice morality might condemn the destruction of the drafts, if the fact is that way, of which we are not certain from the proof, but the legal results as applied to the case in hand are such as we have indicated.

But it is ingeniously argued that it was the duty of Bolton to have revealed the state of the firm business under his control in his answer, and to have filed all papers in possession or furnished them to complainant in the original case, and because of his alleged failure so to do, that he should have this decree annulled and a decree now rendered against him, at any rate, for an account.

We need but say, in so far as his answer is concerned, or the production of papers and books, that under the charges of the original bill, together with the fact that his answer on oath was expressly waived, he was not bound to make any disclosures at all.

In the first place it was distinctly intimated that

Bolton would attempt to supply his books assumed to be lost, or claimed to be so by him, by false copies, "with a view of avoiding just charges," and that complainant would be able to fasten this upon him, unless he produced the original entries, and then the right to surcharge and falsify the original books was expressly reserved in the bill.

In this view, the original books having been burned, in fact, and the proof now only developing the fact that he had a memorandum book—made out by whom we do not know—but one that he claimed showed substantially, as Mr. Apperson remembers, the result of his books at Memphis, if he had tendered such a memorandum, or any thing purporting to be a statement from the books, he would have done precisely what complainants charged he might do, and such a book thus discredited in advance, he was not bound to present.    It would have been folly in him to have done so.

But had it been presented, and shown a balance in his favor, it would have been rejected as evidence at once.    Why should he present such evidence, when nothing he would say in explanation of it would be of any weight, as the complainant had refused to allow him to make a discovery under oath on this subject? In fact, he might have contented himself by filing an answer denying or putting in issue any charge in the bill, thus putting complainant to the proof of her case. If he had filed an elaborate answer, presenting any paper he had, as far as he was concerned, the complainant had by the form of the pleading, only given

the respondent the power to make an issue, and this was all he could do, except at the option of complainant. He was certainly not bound, in that case, to make any disclosure whatever.

But assume that what Mr. Apperson has proven or stated would have been sufficient to have charged him as assumed by complainant, the old difficulty occurs. You would only have had a showing of what the books are supposed to have shown at Memphis, but what had been done at Vicksburg and Lexington would not have been accounted for, and until this was done, there could not be an account of the partnership, as was held by this court in the original case. We see from letters now filed, that Wade Bolton claimed very large sums were to be accounted for by Dickens and Washington Bolton, and pressingly urges them to meet him for a settlement, which they seem as persistently to have avoided. That they retired, and went into other pursuits and made no settlement, nor brought any suit for an account of the partnership, is totally inconsistent with the view now pressed— that they believed immense sums would be due them on such a settlement. The record shows them to have been men who dared to assert their rights, and who were not likely to have slept on them.

But under another principle which we have cited, that the failure in the case must not be attributable to the omission, neglect or default of the complaining party, the result would probably have been the same. Mr. Apperson is the witness now on whose testimony the entire case of complainant rests. He was in Mem-

phis at all times—was not only known to have been the confidential friend and adviser of Wade Bolton— but was made party to the original bill on the charge that he had his books and papers, or the books and papers of the 'firm, in his possession, and required to deliver them up to the clerk and master. He was known to have been his cotton merchant, and so he was the highest source of information to be had on this aspect of the account. When the books could not be produced, or were destroyed, he was the only man by whom it was ·probable they could have been attacked, as was threatened in the bill, so far as the cotton account was concerned. Is it not inexcusable neglect that he was not examined as to his knowledge of Bolton's business transactions, at any rate, to the extent they had been had with his house? He would, as we have no doubt have done, as he says he would, precisely what he has done in this case, when ordered by the court, told all he knew in answer to any question put to him. It is due to him to say, that we do not in this record see any ground on which to predicate any charge of bad faith or untruthfulness to this witness. How far he should or was compellable to answer, when private confidence had been reposed, seems to have been a serious question with him, and on which he took the advice of able counsel, on which he acted, but when directed to answer by the court, he seems to have answered fully and frankly and promptly all questions propounded to him.

We might add other considerations of weight in support of the views expressed, but deem what we

have said sufficient. The result is, · that on the ground of fraudulent suppression of evidence for the reasons given, the complainant's case has 'failed, so far as the acts of Bolton are concerned.

So far as Mr. Apperson, as executor, was concerned, he took the place by revivor of his testator. He undertook to, and was sworn to, execute the will of his testator. The most pervading purpose found in that paper is that the suit shall be defeated. He was not called on to answer any thing, the answer having been made by his testator some six months before his death.

We need not go into the casuistry of the question as to whether he should have furnished testimony, as far as he had it, to the other side without being called on. But that any legal duty rested upon him so to do is a matter of easy solution. No such thing was required, nor was it expected by the other side, nor did they have the slightest cause of complaint if it was not done. He was in the jurisdiction of the court, amenable to its process, and if his testimony was wanted, he had only to be summoned, and examined on oath as other witnesses.

Mr. Perry states the rule, the result of the cases which have considered this question. It is: "If a trustee obtains a knowledge of facts that would defeat the title of his *cestui que trust*, and give the property over to another, he is not justified in morals in communicating such facts to such other person. *His* duty is to manage the property for his *cestui que trust*, and not to keep his conscience, or betray his

title or interests, · and he can make no admissions prejudicial to the rights of his *cestui que trust,* nor can he use his influence to defeat the purposes of the trust as declared by the creator of it: 1 Perry, top page 540. While holding the position of executor, and representing the testator, and especially under the charges of complainant's bill, he was not bound to volunteer any disclosures to the injury of the estate he represented. If he had resigned his position, he was equally unfitted by such an obligation, and so in no event can the failure to disclose the facts charged to have been within his knowledge be any fraud on complainant. They were in fact easily obtained by them from him if they chose to seek for information in that direction. Mr. Apperson swears, however, that no inquiry in reference to the affairs of Bolton was ever even hinted as to him.

In reply to · the ingenious argument of counsel, that if a private settlement had been sought between these partners, it would have been the duty of Wade Bolton to have presented his books and papers fully for that purpose, and therefore in a court of equity the same measure of duty rested upon him in this case, in his answer, we need *but say, that even on* such a settlement, if the party had been told that only his original entries would be received, and they discredited by reserving the right to show them false, and that he was expected to present false abstracts of them instead of the originals, and thus seek an advantage, and that no such abstracts would receive any credence, it could hardly be claimed that the failure

to present the papers already charged as forgeries and frauds, would be a fraud on the other parties. That is precisely this case.

We have not rested our conclusion on this point on the ground assumed by the learned chancellor who tried this case, of the distinction between extrinsic and intrinsic fraud, that is fraud upon the party by reason of something done outside of the main case, by which the other party was prevented from presenting his case to the court, as collusion with his attorney, or preventing the party from obtaining testimony by a false statement to him, or the like; or, as in the case of *United States* v. *Throckmorton*, 8 Otto, 65, *et seq.*, by presenting forged documents or evidences of title. While the principle may be sound, if carefully applied, that the court would not, after a great length of time (in that case twenty years), reopen the case on such proof, we would not feel willing to say that the fact that the fraud was intrinsic rather than extrinsic, if these words have in them any definite distinction, should be laid down as the unvarying rule by this court. It may be, and is no doubt a sound general rule, that where the very question involved in the former litigation was a charge of the very fraud again sought to be investigated, and that issue was determined, no court ought readily to allow that question again to be litigated, especially after a great lapse of time. But to say that in every case this rule should be held a conclusive bar to a reinvestigation, or in a case where it could clearly and by the most conclusive and unmis-

takable testimony be shown, such as the discovery of
writings, or in this case, the after discovery of the
books of Wade Bolton, they showing the means of a
complete settlement of the partnership account, and
that they had been by him suppressed, that in such
a case a court of equity would not give relief, is
going further than sound principle will warrant, not-
withstanding the weight of high authority seeming to
sustain this view. See authorities cited in the case
in 8 Otto.

Nor is the soundness of the distinction seen be-
tween fraud preventing a party asserting his right
"by preventing a party from fully exhibiting his case,.
or by keeping him away from court, a false promise
of compromise, or where defendant never had knowl-
edge of the suit, being kept in ignorance by the act
of the other party, or when an attorney fraudulently
connives at his defeat, or corruptly sells out his client's
interest, which, in the language of Judge Miller in
the case in 8 Otto, 65, 66, are proper cases for
relief; and the other class of cases where the party
defeats the right by suppression or concealment of
testimony which he was bound to discover, or which
the other party could and would have certainly had,.
had it not been for the fraudulent devices of his oppo-
nent. In both cases the fraud and wrong of the
party has simply defeated the right sought to be
asserted; each is equally effective on the result, each
equally reprehensible, and the one should be relieved
against as readily as the other, the only difference
probably being that courts should require the strong-

est possible case to be made out where the very question in issue in the original case was the existence of the fraud. Be this as it may, we prefer to rest the case on the grounds we have stated, and deem them conclusive of this aspect of the case. See our own cases of *Wallace* v. *Day*, 8 Baxt., 78; *Haynes* v. *Powell*, 1 Leâ, 353.

We now proceed to dispose of the other aspect of the case, as a bill of review for newly discovered testimony. We pass for the present at least the preliminary question, whether such a bill will lie in a court of chancery when the case has by appeal been brought to this court, and a final decree had. A few principles, the result of the caution found by experience to be necessary to the ends of justice, as well as a sound public policy, and long recognized by our courts, will furnish the basis on which a proper conclusion can be reached on this phase of the case.

It is settled that a bill of review for newly discovered testimony is not matter of strict legal right, but is in the sound discretion of the courts. Leave to file such a bill may properly be refused, although the facts, if admitted, would change the decree, where the court, looking to all the circumstances, shall deem it productive of mischief to innocent parties, or for other good cause appearing: *Winchester* v. *Winchester*, 1 Head, 460; *Harris* v. *Edmondson*, 3 Tenn. Ch. 214, and authorities cited. Nor will such a bill be allowed where it would be entirely fruitless: 3 Tenn. Ch., 215, citing *Bennett* v. *Lee*, 2 Atkins, 530; *Thomas* v. *Harvie*,

10 Whart., 151. The object and purpose of a bill of review being to reverse the decree formerly made by a re-trial, when it is for newly discovered testimony, upon the original record, with the new matter added. See Meigs' Dig., vol. 1, sec. 575, and authorities cited. It is obvious that the bill must show clearly the testimony discovered, and that it must fairly appear that with such added evidence a differrent and opposite result must be reached: *Beeson* v. *Dosser*, 1 Heis., 761. In addition, where the bill is for newly discovered evidence come to light after the former decree, it must be such that could not have 'been possibly had when the decree was had. The party not only must have been guilty of no negligence, but must appear to have been diligent in the effort to develop his case on the former trial: 1 Lea, 310: *Eaton* v. *Dickinson*, 3 Sneed, 397.

In view of these settled principles we notice the facts presented in this record. In the first place there is no definite allegation of facts discovered from which the court could see that they would have changed the result. The opinion of Mr. Apperson that he knew facts that would have done so is not such a statement as would meet the requirement of the rule.

But conceding, for the sake of argument, that this might have been a sufficient basis on which to file the bill with a prayer for discovery from him, then how would the case stand on the facts actually developed?

As to the money said to have been spent in the McMillan trial, the present bill avers that the amount

was proven on the former hearing to have been about $100,000, and so any evidence on that point was unnecessary, and at most, could only be cumulative to what was already sufficiently proven—already in proof. As to the $70,000 of drafts assumed to have been destroyed, we have stated the main facts already. It suffices to say, that it is clear, from Mr. Apperson's remembrance of what was stated, after the long lapse of time, by Bolton, was substantially, only that these drafts would not rightly charge him, but would tend to do so simply because his books and vouchers had been destroyed by fire, and if he had them, they would all be sufficiently accounted for. It was for this reason, and because he believed the burning had been caused by his former partner, Dickens, that he justified his purpose to destroy these drafts, or as he said, "fighting the devil with fire." There can be nothing in this.

The main matter developed by Apperson's testimony, is the fact of large profits having been made by unfair dealing with the cotton of the firm. Assume this to be proven, the fact also is proven by Mr. Apperson, that he did not know, and had no idea of the amount thus wrongfully used, and it is clear he is the only man now living who knows even this much; under this state of facts, an account even of this matter would yield no results on which a decree could be based. In addition, as we have shown, and as was formerly adjudged, there is absolutely no means of showing the state of the general account of the firm outside of this, and no account can properly be had without this.

But another answer is conclusive on a bill of review, that this testimony of Mr. Apperson was all accessible to complainant in the former suit. The parties by asking a decree on this witness' testimony endorse his credibility, and so it was only necessary to have summoned him as a witness and he would have told all he knew, we have no reason to doubt. He was well known to have been the confidential friend of Mr. Bolton, to have been his cotton merchant, was made party to the original bill because he had in his possession the books and papers of Bolton, or was assumed to have them. Why was it not possible to have had the testimony of this witness on the former hearing of this case? Reasonable diligence, and it seems common prudence, would have at least demanded an effort on the part of complainant to have ascertained what he knew. A subpœna would have brought him before the court, and he would have been compelled to answer all proper questions.

Again, it appears from the papers now presented and delivered into court, on demand of complainant, that Wade H. Bolton was most earnestly pressing upon complainant's intestate for a settlement of the partnership affairs; that he had proposed to meet them prepared for this purpose, when all parties were alive, and they had agreed to meet him but failed to do so; that he had charged him with wrongful appropriation of thirty or forty thousand dollars of the assets of the firm, and yet with all this, the other party refused or failed to meet him for a settlement and vindication of himself from these charges for years.

Take this in connection with the fact that his books were concealed or made way with by him, and have never seen the light in this case yet, and then, instead of seeking a settlement he and the other partners had quietly engaged in other pursuits, and we are inevitably driven to the conclusion reached by the Chief Justice in the former cases, that the probabilities are these partners were satisfied they had nothing to gain by a settlement, and each was content to retain what he had, and let the matter rest.

We need but add, that it would be more than doubtful whether any court would undertake to take an account of a partnership so complicated as this, upon the basis of the memory of one witness, as to what had been told him by one partner, many years after the conversation occurred, unsupported by writings, or any documentary evidence of the state of the accounts. Such a thing, we take it, has never been done in the history of equity jurisprudence.

Upon the whole case, we conclude, the application of the stern rules of law, too well established and too well grounded in reason and experience to be shaken, demands and compels us to repel the claim of complainant. Injustice may be done, but it is a misfortune incidental to all human transactions sometimes, but where we can certainly see it is impossible to do affirmative and complete justice on the facts before us, or even approximate it, it is our plain duty, as was said by the Chief Justice it was proper to do in the original case, to let the parties remain where their own laches had placed them, and to leave, as they

left, a complex state · of ' things unsettled, rather than, risk doing gross injustice, after such complete acquiesence for so long a time on their part.

The result is the decree of the chancellor dismissing the bill is affirmed with çosts.